United States District Court
for the Northern District of Illinois
Eastern Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | No. 1:18-CR-00607 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| AARON CLARK, ) | |
| ) | |
| Defendant. ) | |

**Memorandum Opinion and Order**

Aaron Clark is charged with knowingly possessing a firearm after being convicted of a felony. 18 U.S.C. § 922(g)(1). During the course of the prosecution, his defense counsel encountered some difficulty with communicating with Clark and also learned that Clark previously had been diagnosed with schizoaffective disorder. R. 37.[1] So defense counsel filed a motion to determine Clark's mental competency. *Id.* Each side hired psychologists to examine Clark, and the psychologists generated reports and testified at an evidentiary hearing. As explained in this Opinion, on review of the testimony and the record evidence, the Court finds that Clark is mentally competent: he understands the nature and consequences of the proceedings, and he is able to properly assist in his defense.

---

[1]At this point, after the examinations of Clark (in which he discussed the case at some length with the experts, particularly the government's expert), the evidentiary hearing, and the oral argument, it would appear that the sealed version of the motion for the competency hearing, R. 37, can be unsealed (or at least parts of it). By April 21, 2021, defense counsel shall file a Position Paper on whether the motion should be unsealed.

1

## I. Background

Clark not only is charged with possessing a firearm after being convicted of a felony, 18 U.S.C. § 922(g)(1), the government believes that his prior convictions qualifies him as an armed career criminal, so the indictment also charges Clark under that provision, 18 U.S.C. § 924(e)(1). R. 1, Indictment. It turns out that the alleged offense conduct is relevant to the mental-competency determination, so it is worth summarizing the evidence (or, at least, what the government intends to prove). This summary is drawn from the expert report written by the government's expert-psychologist witness, Dr. Diana Goldstein, who in turn drew the facts from the Chicago Police Department report of Clark's arrest. Gov. Exh. 2, Goldstein Report at 3. For purposes of the competency determination, Clark has not disputed the description of the government's evidence, but of course has not admitted that those facts are true.

On February 25, 2018, a car in which Clark was a passenger was pulled over for expired license plates. Goldstein Report at 3. The officers asked the driver for his license and proof of insurance, but the driver had neither; plus, the driver appeared nervous (according to the police report). *Id.* So the officers asked the driver and Clark to get out of the car. *Id.* Clark provided the officers with his name; after running his name, the officers determined that he was a convicted felon with four outstanding arrest warrants. *Id.* The officers searched the car and found a gun under the passenger seat (remember that Clark was the passenger). *Id.* The arrest report asserts that Clark absolved the driver and took full responsibility, admitting, "My guy don't have anything to do with this. This gun is all mine." *Id.* After being taken to the police

station, Clark waived his *Miranda* rights and again affirmed that the gun belonged to him. *Id.* Those are the key underlying facts on the offense conduct, at least as the government would offer them at trial.

After receiving medical records confirming that Clark previously had been diagnosed with schizoaffective disorder, as well as with depression and substance-abuse disorders, and after becoming concerned that Clark could not assist in his own defense, defense counsel moved for a competency hearing, 18 U.S.C. § 4241(a). R. 37. The Court granted the motion, R. 45, setting in motion the hiring of expert psychologists on both sides. Clark first was evaluated by Dr. Michael Gelbort, the defense expert, and later by Dr. Diana Goldstein, the government's expert. R. 45, R. 50. Both experts submitted reports and curricula vitae. *See* R. 83-1, Goldstein C.V., R. 83-2, Report of Dr. Diana Goldstein; R. 84-1, Gelbort C.V., R. 84-2, Report of Dr. Michael Gelbort. The Court held a competency hearing, via video-conference, across three days, during which both experts testified and counsel for both sides presented argument. R. 88, 89, 90.

## II. Analysis

### A. Definition of Mental Competency

The federal criminal code disallows prosecutions from continuing if a defendant is more likely than not "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," 18 U.S.C. § 4241(d). Two forms of mental incompetency are embedded in

3

that definition: (1) the defendant is unable to understand the nature and consequences of the case; and (2) the defendant is unable to properly assist in his defense. *Id.* So (to put in affirmative terms) mental competency requires more than general knowledge of the defendant's situation and general memory of the alleged events. "It is not enough for the district judge to find that the defendant is oriented to time and place and has some recollection of events." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (cleaned up).[2] Rather, "the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* The mental-competency standard is identical for pleading guilty and for standing trial. *Godinez v. Moran*, 509 U.S. 389, 398–99 (1993); *see also McManus v. Neal*, 779 F.3d 634, 656 (7th Cir. 2015) (trial); *United States v. Stoller*, 827 F.3d 591, 595–96 (7th Cir. 2016) (guilty plea). This is the standard that the competing experts applied, and it is time to summarize the competing reports.

### B. Summary of Defense Report

Clark was evaluated for the defense by clinical neuropsychologist Michael Gelbort, Ph.D., across four sessions in September and October 2019. Gelbort Report at 1. Gelbort's report describes the evaluation as having "the general purpose of understanding his [Clark's] neuropsychological and clinical functioning and the more specific question of whether he possesses the requisite cognitive and emotional

---

[2]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

functioning to be able to consult with [defense counsel] with a reasonable degree of rational understanding in preparation and presentation of his defense, as well as whether he has the ability to have a rational as well as factual understanding of the proceedings against him." *Id.* To this end, Gelbort interviewed Clark, took his personal history, and administered a number of neuropsychological tests: the Wechsler Adult Intelligence Scale–IV (WAIS-IV), Wide Range Achievement Test–III, Trail Making Test Parts A and B, Halstead Category Test, subtests from the Wechsler Memory Scales–IV, and portions of the Luria Nebraska Neuropsychological Battery. *Id.* It does not appear from his report that Gelbort sought or reviewed Clark's medical or criminal-history records.

The bulk of Dr. Gelbort's report is concentrated on Clark's intellectual abilities. Gelbort diagnosed Clark with Intellectual Disability, in large part based on Clark's Full Scale IQ test score of 65, which places him in the lowest 1% of the population. Gelbort Report at 3. Gelbort also observed meaningful differences across various subtests. Clark's performance on the Working Memory Index and Processing Speed Indices was slightly stronger, placing him in the "Borderline Intellectually Disabled" range, as compared with his lower performance on the Verbal Comprehension Index and Perceptual Reasoning Index. *Id.*

Dr. Gelbort further assessed Clark's academic achievement, finding that his sight-reading ability was equivalent to a second-grade level, his spelling was at a third-grade level, and his mathematical computational abilities at a fourth-grade level. Gelbort Report at 3. Gelbort observed that a sixth-grade level is typically "what

5

is deemed necessary for functioning in adult activities." *Id.* Gelbort's evaluation also revealed that Clark has weaknesses and limitations in "higher cognitive abilities," including verbal-processing speed, quick thinking, problem solving, and executive functioning; in each area, Clark performed below the second percentile. *Id.* at 4. Gelbort opined that, although Clark can participate in a conversation and may appear "normal" to a lay observer, Clark nonetheless has significant impairments. *Id.*

Based on those impairments, Gelbort reasoned, although Clark performs well enough "in areas of concrete thinking such as visual scanning speed and remaining free from distraction, his weaknesses occur in more significant areas (problem solving, reasoning, judgment) if adaptive skills and coping/functioning in intellectual or self-preservation activities are of concern." *Id.* at 4. Gelbort opined that those weaknesses—in "problem solving, reasoning, judgment"—"*strongly suggests* that he does not possess the requisite intellectual and cognitive abilities to perform in his role," that is, to assist in his own defense. *Id.* at 4–5 (emphasis added). Gelbort went on to say that Clark "certainly" could not assist in his defense "at a normal rate of speed or without significant ongoing coaching and teaching." *Id.* at 5.

### C. Summary of Government Report

Clark was evaluated for the government by clinical neuropsychologist Diana Goldstein, Ph.D., during two sessions in March 2020. Goldstein Report at 1, 8. At the outset, it is evident that Dr. Goldstein's report reflects a far more detailed review of relevant records than Dr. Gelbort's. In particular, in addition to the clinical interviews and testing, Goldstein obtained and reviewed 17 sets of records comprising

6

much of Clark's available medical and criminal-history records. *Id.* at 2–3. Beyond those records, Goldstein also reviewed excerpts from audio-recordings of calls made during Clark's post-arrest detention in Cook County Jail. *Id.* In the calls, Clark explicitly discussed the alleged offense conduct (more on this later in the Opinion). *Id.* at 3–4.

In her report, Dr. Goldstein raised significant challenges to Dr. Gelbort's methodology. She observed, for example, that Gelbort relied entirely on Clark's memory about his personal and medical histories, rather than confirming this information against available records. Goldstein Report at 5. She noted that Gelbort did not inquire into Clark's adaptive functioning, which is typically a key component of a diagnosis of intellectual disability. *Id.* She critiqued many of the assessments that Gelbort administered, opining that particular assessments are outdated, no longer considered reliable within the field of neuropsychology, and not adequately controlled so as to give an accurate portrayal of Clark's abilities. *Id.* at 5–6. For example, Goldstein explained that the Halstead Category Test, which Gelbort administered, has not been used since 1979. *Id.* at 5. Even assuming this was a typographical error of some sort and that Gelbort in fact used the newer form of this test (called the Booklet Category Test), Goldstein observed that race and education levels have been shown in the last few decades to be significant moderating variables, and thus that Clark's performance on this test would be disproportionately poor if his scores were not compared to his peer group. *Id.* Goldstein also critiqued the Luria Nebraska Neuropsychological

7

Battery as not reliable and not valid, and noted that these critiques have been raised in the field of neuropsychology since the 1980s. *Id.* at 6.

Aside from critiques of Dr. Gelbort's testing methodology, Dr. Goldstein also pointed out that Gelbort's report actually made "no direct competency-related inquiries" during his sessions with Clark. Goldstein Report at 8. Indeed, Gelbort actually offered "no formal competency opinion." *Id.* Instead, Goldstein noted, Gelbort only concluded that Clark's limited intellectual ability "strongly suggests" that Clark cannot assist in his defense. *Id.*

For now, these are sufficient summaries of the dueling expert reports. It is time to make findings based on those reports, the expert testimony at the hearing, and the record evidence as a whole.

### 1. No Psychotic Disorder

As an initial matter, the record refutes any suggestion that Clark suffers from any "mental disease," 18 U.S.C. § 4241(d), such as a psychotic disorder, that would render him mentally incompetent to be prosecuted. Nor does Clark argue that he is incapable of understanding the "nature and consequences of the proceedings against him." *Id.* Indeed, during the evidentiary hearing, Dr. Gelbort acknowledged that Clark *does* understand the nature of the proceedings. Instead, if anything, Gelbort's diagnosis of an intellectual disability would be (in the outdated words of the statute) a "mental defect," *id.*, that might prevent Clark from assisting in his defense. For completeness's sake, it is worth explaining why the record does not support a finding that Clark suffers from a mental disorder that renders him incompetent.

8

Dr. Goldstein's report extensively and persuasively analyzed Clark's developmental, social, medical, and psychiatric history. Goldstein Report at 11–22. To start, Clark suffered through an unstable and abusive upbringing. *Id.* at 11–12. He began to have behavioral problems at an early age, including shoplifting around age 8 or 9, animal cruelty at age 10 or 11, persistent vandalism and fighting as a pre-teen, and joining a gang around age 12 or 13. *Id.* at 12. He was first arrested as a teenager and was sent to juvenile detention; he was first tried as an adult at age 16. *Id.*

Clark also self-reported having been diagnosed with numerous learning, behavioral, and psychiatric disorders as a child, such as attention deficit disorder with hyperactivity, and schizophrenia. Goldstein Report at 13. Clark told Dr. Goldstein that he was barely educated, having attended an "alternative school" "all my life," dropping out in ninth grade after having rarely attended classes. *Id.* It is also true that Clark's medical records showed past diagnoses of schizophrenia. *Id.* at 15. In his interviews with Goldstein, Clark expressed the continued belief that he has schizophrenia. *Id.* at 15–16. Clark even asserted that he heard voices in his head as early as age 10 or 11, and indeed was still hearing a "little voice." *Id.* But Clark then asserted that the "voice started a couple of years ago" when "I was an adult." *Id.* at 16. After the inconsistency was pointed out to Clark, he returned to the assertion that he started hearing voices at age 10 or 11. *Id.* Goldstein pointed out that Clark's claim that he was hearing voices had not previously been noted in any other available record. *Id.* at 20.

9

Based on this history, both documentary and self-reported, Dr. Goldstein diagnosed Clark with a Conduct Disorder, an Antisocial Personality Disorder, and various alcohol and substance use disorders. Goldstein Report at 46–49. But Goldstein rejected the notion that Clark truly suffered from a psychotic disorder: "Mr. Clark does not now, nor has he ever in the past, qualified for a diagnosis of a Psychotic Disorder." *Id.* at 48. Instead, Goldstein concluded that "[m]alingering is the most reasonable explanation" for Clark's asserted psychotic symptoms. *Id.* The Court agrees with this conclusion. The inconsistency in Clark's reported onset of hearing voices—that is, at what age he first started hearing voices—casts doubt on the credibility of his self-report. *Id.* at 15–16. The probability of that symptom is further undermined by the complete absence of a self-report—whether as a child or an adult—in the substantial medical records reviewed by Goldstein. *Id.* at 48. What's more, there is no reference whatsoever in the defense expert report to Clark hearing voices, whether in the past or in the present. *See* Gelbort Report at 1–5. The Court discredits the report of that symptom, and concludes that Clark does not suffer from a psychotic disorder.

**2. Intellectual Disability**

With the possibility of a psychotic disorder rejected, the crux of the defense expert's report and testimony is that Clark suffers from Intellectual Disability, and that the disability prevents Clark from assisting in his defense. Remember that Gelbort assessed Clark's Full Scale IQ as 65, which falls within the lowest 1% of the population. Gelbort Report at 3. The other tests administered by Gelbort led him to conclude that Clark reading, spelling, and math abilities rate at the second-, third-,

10

and fourth-grade levels respectively. *Id.* Based on other assessments, Gelbort opined that Clark's problem solving, reasoning, and judgment are impaired. *Id.* at 4.

      The first problem with Gelbort's written report is that he does not offer a definitive finding of incompetency. The report merely says that Gelbort's evaluation of Clark "*strongly suggests* that he does not possess the requisite intellectual and cognitive abilities" to assist in his own defense. Gelbort Report at 4–5 (emphasis added). That hedge ("strongly suggests") appears to be intentional, because the report goes on to say that Clark "certainly" could not assist in his defense "at a normal rate of speed or without significant ongoing coaching and teaching." *Id.* at 5. During the evidentiary hearing, Gelbort's testimony on his opinions did not move much beyond the report's tepidness. (This is not a pejorative criticism of Gelbort, but merely pointing out that his testimony was not much more definitive than the report.) Gelbort continued to express his opinion in a way that embedded the possibility that Clark could assist in his defense if conferrals were slowed down, that is, that Clark's cognitive difficulties would require double-checking of his understanding of the proceedings or concepts. When asked whether Gelbort held his opinions to a reasonable degree of scientific (or neuropsychological) certainty, he initially responded yes. But then Gelbort again couched the opinion with qualifiers, saying "I think" that Clark is weaker than he would "probably" need to be to assist in his defense in an "adaptive fashion," which again leaves open the possibility of careful and slowed-down conferral. Asked again about the ultimate competency opinion, Gelbort again say that Clark failed the

11

second competency requirement (that is, to assist in his own defense), but again immediately hedged by saying that "I would think" that Clark could not proceed.

The second problem with Gelbort's report is the complete absence of any examination of Clark on the direct issue at hand: whether Clerk could assist in his defense and meaningfully engage with defense counsel. Instead, the report recited Clark's medical and personal history, Gelbort Report at 2, and then reported on Clark's scores in various neuropsychological assessments, *id.* at 3–4. Nowhere in the report does Gelbort describe posing questions to Clark about defending against the prosecution. Moving beyond the report, at the evidentiary hearing, on direct examination, Gelbort testified only that he discussed with Clark the role of the attorneys and the judge (and actually concluded that Clark was reasonably aware of their respective duties)—but did not describe any discussion about defending the case and engaging with defense counsel. On cross-examination, Gelbort conceded that he had not discussed the evidence with Clark. But Gelbort also asserted (on cross-examination) that Clark had stated, when discussing legal strategy, something to the effect that because Clark had not been holding the gun, it could not necessarily be attributed to him. Nothing in this testimony undermines Goldstein's much more thorough examination on the core issue of assisting in the defense (more on this in the next paragraph). The purported discussion is not in the report, so its credibility is undermined;[3] the testimony

---

[3]The Court is not saying that Gelbort intentionally misdescribed on cross-examination this discussion with Clark. It *is* to say that the omission of this topic from the written report means that Gelbort was testifying from memory over one year after the interview (which resulted in very little detail about it in the hearing, even if they engaged in the discussion) and also means that, unfortunately, it weakens the credibility of Gelbort's ultimate opinion

describes not more than a few sentences about the discussion; and what is described, if true, does not alter competency because it is actually accurate that the fact that the gun was not recovered in Clark's direct possession makes it harder to attribute the gun to him.

In comparison, Dr. Goldstein interviewed Clark extensively about his understanding of the charge and the defense—and she memorialized this discussion at length in the written report, Goldstein Report at 29–34, plus credibly testified consistently about Clark's ability to assist in the defense. According to Goldstein, Clark understood that the charge is for possessing a firearm as a convicted felon. *Id.* at 29. He was familiar with many critical terms and concepts, such as "arrest," "evidence," "testimony," "arraignment," "plea agreement," "trial," and "indictment." *Id.* at 29–32. The plea and the trial aspects of the proceeding are especially important, because Clark's vacillation between those two choices is what in part prompted defense counsel to request the competency hearing.

Most importantly, Clark was able to speak with reasonable accuracy on core legal issues. For example, on actual versus constructive possession, Clark told Dr. Goldstein that he "want[ed] to fight" the current charge against him on the grounds that "[t]hey say they caught me with a gun, but they just *found* a gun and said it was mine." Goldstein Report at 29 (emphasis in original). He later repeated the importance of the fact that "[t]he gun was in the car, not on me." *Id.* at 33. At the same

---

because he did not believe this crucial topic was important enough to include in the written report.

13

time, recognizing the evidence from the Cook County Jail telephone recording, Clark conceded, "They have me on tape saying it's mine." *Id.*

Dr. Goldstein also probed Clark's vacillation between pleading guilty and going to trial. In response, Clark told Goldstein that he had initially planned to plead guilty when the charges were only in state court. Goldstein Report at 29. The state plea agreement offered him four years in custody. *Id.* But when the federal government brought charges, then the situation became worse. *Id.* As Clark understood it, the Sentencing Guidelines would set him at a "33" even if he pled guilty. *Id.* Although the Court is not privy to the plea discussions of the parties (nor is the Court asking to be), that actually is consistent with the default Armed Career Criminal offense level under Guideline § 4B1.4(b)(3)(B). And with the *statutory* mandatory minimum of 15 years, it sometimes is true that a defendant in Clark's shoes in effect gets "no credit for accepting responsibility," Goldstein Report at 29—as Clark himself explained it—because of the 15-year floor. Clark also understood the unpredictability of whether he would be sentenced as an Armed Career Criminal, and (quite naturally) expressed frustration that the government would not tell him whether he qualifies or not. Goldstein Report at 33. Based on these parts of Goldstein's report and her supporting hearing testimony, the Court finds that Clark's vacillation is simply the product of the difficult situation in which he finds himself—and not caused by mental incompetency. He is reasonably and rationally working through the difficult circumstances.[4]

---

[4]Of course, the Court takes no position at all on whether Clark should or should not plead guilty. It is entirely up to him.

It is worth noting too that, even accepting for argument's sake Dr. Gelbort's diagnosis of Intellectual Disability, Dr. Goldstein credibly explained, both in her report and on the witness stand, that Clark is sufficiently high-functioning to assist in his defense (indeed, Goldstein rejected the diagnosis altogether). On Clark's intellectual abilities, Goldstein also administered an array of cognitive tests assessing effort and motivation, intellectual functioning, academic achievement, attention and concentration, learning and memory, language functioning, executive functioning, and motor functioning. Goldstein Report at 35–41. Although Goldstein too found that Clark's general intelligence is extremely low and that his Full Scale IQ was 67 (only two points higher than Gelbort's finding), she explained that in all four areas of cognitive functioning (verbal knowledge, perceptual reasoning, working memory, and processing speed), Clark achieved at least some Low Average ratings in each of the cognitive domains. *Id.* at 37. Goldstein's report and testimony also explained that, although Clark likely has a verbally based learning disorder, *id.* at 43, this is more of an academic concepts problem (vocabulary, grammar, and syntax) rather than a problem understanding verbal explanation, *id.* At most, in expressing himself, Clark's problems are "mild in severity." *Id.* Goldstein also repeatedly explained that Clark had no reluctance, anger, or embarrassment on either end of clarifying communications. That is, if Clark had difficulty understanding Goldstein, then he would simply ask for clarification; conversely, if she had difficulty understanding him, then she would ask for clarification, and he would clarify. Although these obstacles might justify careful attention to Clark's communicative needs either at a change of plea

hearing or during a trial, the Court credits Goldstein's opinion that Clark can reasonably assist in his defense.

Finally, it is worth noting that the recorded calls at Cook County Jail support the competency finding. As described in Dr. Goldstein's report, Goldstein Report at 3–5 (Clark has not challenged the accuracy of the excerpts, Clark recounts the night of his arrest, admitting that he had the gun (using the slang term "bumper") "on me," and then saw the police down the street, so he "took it up off me, and kicked the motherfucker halfway up under the seat." *Id.* at 5. In another call, he stated that he knew that "I ain't have no business with a pistol on me," presumably because of his prior convictions. *Id.* Most importantly, in a February 27, 2018 call, Clark spoke with the car's driver, Jerry Edmond. *Id.* at 4. During the call, Clark refuted Edmond's statement that Edmond thought the gun (the "bump") was in the trunk of the car— indeed, Clark reminded Edmond that Clark had taken the "bump" out of the trunk when they made a stop. *Id.* So Clark had a detailed memory of the events and was able to promptly correct Edmond's faulty recollection. Clark went on to describe the drivers traffic maneuvers before the stop, going so far as to say that, after the driver made a second U-turn, "we was dead already …. Cuz now we looking suspicious." *Id.* This detailed recitation of the facts—and the *inferences* to be drawn from the facts— further corroborates that Clark can assist in his own defense. Of course, the Court is not deciding that the statements are admissible, nor is the Court drawing any other conclusions about the statements. And it bears emphasizing again that it is entirely up to Clark whether he wants to plead or instead go to trial. The recorded calls do

16

show, however, the significant level of comprehension with which Clark discusses the events.

### III. Conclusion

In sum, the Court finds that Clark is mentally competent: he understands the nature and consequences of the proceedings against him and he can assist properly in his defense. The Court certainly will consider any steps, out of an abundance of caution, to accommodate any additional time or explanations that Clark might need during any phase of the case, including at a change of plea hearing or during trial.[5] In any event, defense counsel shall confer with the Defendant to decide on the next step of the case. The tracking status hearing of April 23, 2021, is reset to a video status hearing on April 26, 2021, at 2:30 p.m. (If, after conferral, the defense counsel is confident about the next step, then counsel may email the courtroom deputy and the government in advance and in lieu of the next status hearing to propose a schedule.)

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: April 16, 2021

---

[5] For example, during a trial (if Clark chooses to go to trial), breaks after direct examination and before cross-examination might be warranted so that he can confer with defense counsel.